No. 25-5313

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LESLIE BERLAND,

*Plaintiff–Appellee,*

v.

X CORP., Successor in Interest to Twitter, Inc; X HOLDINGS CORP.; ELON MUSK; LINDSAY CHAPMAN; DHRUV BATURA; BRIAN BJELDE; TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY,

*Defendants–Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)
No. 3:24-cv-07589-JSC, Hon. Jacqueline Scott Corley

## ANSWERING BRIEF OF PLAINTIFF–APPELLEE
## LESLIE BERLAND

Teresa S. Renaker
Kirsten G. Scott
RENAKER SCOTT LLP
505 Montgomery St., Suite 1125
San Francisco, CA 94111
(415) 653-1733

Nathan E. Denning
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
(212) 551-2600

David R. Roth
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
(203) 498-4400

*Attorneys for Plaintiff–Appellee Leslie Berland*

## TABLE OF CONTENTS

Table of Authorities .............................................................. iii

Preliminary Statement ........................................................... 1

Jurisdictional Statement ......................................................... 6

Statement of the Issues .......................................................... 7

Statement of the Case ........................................................... 7

    I.    Berland joined Twitter in 2016 and signed a Dispute
        Resolution Agreement. .................................................. 8

    II.   Between 2018 and 2022, Berland and Twitter entered into
        five equity award agreements requiring litigation of
        claims arising under the award agreements in California
        court. ................................................................. 12

    III.  Berland sued Defendants after they refused to honor her
        equity awards and other employment benefits following
        her termination from Twitter. ......................................... 14

    IV.  After repeatedly telling the District Court that Berland's
        state-law claims should be resolved in court, Defendants
        reversed course and belatedly moved to compel
        arbitration of Counts Three and Four. .............................. 18

Summary of the Argument ...................................................... 27

Standard of Review ............................................................. 31

Argument ...................................................................... 32

    I.    The District Court correctly denied Defendants' motion to
        compel arbitration of Counts Three and Four. ...................... 32

        A.   This case is just like *Suski*. ..................................... 33

        B.   Defendants' reading of the Award Agreements
           makes the forum-selection clauses superfluous. .............. 43

i

C.    The 2018–2022 Award Agreements do not "predate" the 2016 Dispute Resolution Agreement and are not part of a single 2016 transaction. ....................53

II.    Defendants waived their purported right to arbitrate. ..............61

Conclusion..............................................................................................................71

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashbey v. Archstone Property Management, Inc.,*
  785 F.3d 1320 (9th Cir. 2015)..........................................................32

*Brown v. Arizona,*
  82 F.4th 863 (9th Cir. 2023).......................................................31, 62

*Caccuri v. Sony Interactive Entertainment, LLC,*
  735 F. Supp. 3d 1139 (N.D. Cal. 2024) .........................................63

*Cape Flattery Ltd. v. Titan Maritime, LLC,*
  647 F.3d 914 (9th Cir. 2011)...........................................................46

*Coinbase, Inc. v. Suski,*
  602 U.S. 143 (2024)........................................................................36

*Country Life Homes, Inc. v. Shaffer,*
  No. Civ.A. 2288-S, 2007 WL 333075 (Del. Ct. Ch. Jan. 31,
  2007) ........................................................................................40, 60

*Dasher v. RBC Bank (USA),*
  745 F.3d 1111 (11th Cir. 2014)......................................................42

*Davis v. Nordstrom, Inc.,*
  755 F.3d 1089 (9th Cir. 2014).........................................................31

*Doe 1, v. AOL LLC,*
  552 F.3d 1077 (9th Cir. 2009).........................................................42

*Goldman, Sachs & Co. v. City of Reno,*
  747 F.3d 733 (9th Cir. 2014)...........................................................32

*Goldman, Sachs & Co. v. Golden Empire Schools Financing
  Authority,*
  764 F.3d 210 (2d Cir. 2014) ............................................................41

*Green Isle Partners, Ltd. v. Ritz-Carlton Hotel Co. L.L.C.,*
 No. Civ.A. 18416, 2000 WL 1788655 (Del. Ct. Ch. Nov. 29,
 2000) ..................................................................................................40, 60

*Hill v. Xerox Business Services, LLC,*
 59 F.4th 457 (9th Cir. 2023)............................................................*passim*

*Karasek v. Regents of University of California,*
 956 F.3d 1093 (9th Cir. 2020) ...............................................................31

*Knutson v. Sirius XM Radio Inc.,*
 771 F.3d 559 (9th Cir. 2014)...........................................................32, 58

*Lexington Insurance Co. v. Centex Homes,*
 795 F. Supp. 2d 1084 (D. Haw. 2011) ...................................................49

*Ma v. Golden State Renaissance Ventures, LLC,*
 No. 21-cv-00856-WHO, 2021 WL 2190912 (N.D. Cal. May 31,
 2021) .................................................................................................54, 59

*Mohamed v. Uber Technologies, Inc.,*
 848 F.3d 1201 (9th Cir. 2016)........................................................59, 61

*Morgan v. Sundance, Inc.,*
 596 U.S. 411 (2022)................................................................................62

*Personal Security & Safety Systems Inc. v. Motorola, Inc.,*
 297 F.3d 388 (5th Cir. 2002)..................................................................59

*Premier Floor Care, Inc. v. Albertsons Cos., Inc.,*
 No. 21-cv-04188-EMC, 2024 WL 4844372 (N.D. Cal. Nov. 20,
 2024) ......................................................................................................46

*Resource Group International Ltd. v. Chisti,*
 91 F.4th 107 (2d Cir. 2024)....................................................................41

*Roma Mikha, Inc. v. Southern Glazer's Wine & Spirits, LLC,*
 No. 22-cv-01187-FWS-ADS, 2023 WL 3150076 (C.D. Cal. Mar.
 30, 2023) ..........................................................................................54, 59

*Summit Contractors, Inc. v. Legacy Corner, LLC,*
 147 F. App'x 798 (10th Cir. 2005) .........................................................41

iv

*Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.,*
    206 A.3d 836 (Del. 2019) ...............................................................45

*Suski v. Coinbase,*
    55 F.4th 1227 (9th Cir. 2022)...................................................*passim*

*Suski v. Marden-Kane, Inc.,*
    No. 21-cv-04539-SK, 2022 WL 103541 (N.D. Cal. Jan. 11, 2022) ...............34

*United Farmers Agents Association, Inc. v. Farmers Group, Inc.,*
    244 Cal. Rptr. 3d 27 (Ct. App. 2019) ........................................45, 51

## Statutes

9 U.S.C. § 4.......................................................................................49

9 U.S.C. § 9.......................................................................................49

9 U.S.C. § 16(a)(1)(A) ......................................................................6

28 U.S.C. § 1331................................................................................6

28 U.S.C. § 1367................................................................................6

## Other Authorities

"Arise," Black's Law Dictionary (12th ed. 2024) ............................................46

## PRELIMINARY STATEMENT

In 2016, Plaintiff-Appellee Leslie Berland accepted an offer from Twitter, Inc. ("Twitter"), the predecessor of defendant-appellant X Corp., to become its Chief Marketing Officer. In the years that followed, Berland's tenure was remarkably successful, and she became one of the most respected marketing officers in the world. Consistent with her success, Twitter awarded her equity in the company through five equity award agreements that Berland and Twitter signed in 2018, 2019, 2020, 2021, and 2022 (the "Award Agreements"). Each of them provided that, "[f]or purposes of litigating any dispute that arises under" the Award Agreements, "the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted" in California courts.

After Berland and Twitter signed the last of these Award Agreements, defendant-appellant Elon Musk became embroiled in a contentious lawsuit with Twitter over his effort to back out of an offer to buy the company. When he was ultimately forced to honor his contract, he exacted revenge on Twitter's management, which had forced him to consummate the purchase, by

1

immediately firing them and concocting pretextual "Cause[s]" for those firings to try to avoid paying them millions of dollars under company severance plans. At first, Berland was spared Musk's wrath. But after she made what Musk called a "bad recommendation" about another employee, Musk abruptly fired her too. As with Twitter's other executives, Musk and the other Defendants then devised post hoc "Cause[s]" for Berland's firing, several of which were the same as those levied against the previously fired executives, and refused to pay her millions of dollars she was owed.

Berland responded by suing X Corp., Musk, and others involved in Musk's scheme, asserting two claims under ERISA for the company's refusal to honor its severance policy and two state-law contract claims based on Musk and X Corp.'s breach of the five Award Agreements. For months, Defendants gladly litigated this entire case in the Northern District of California, repeatedly telling the District Court that Berland's claims should be resolved in court and explicitly saying that her suit was not "suitable for reference to binding arbitration." But after seven months of litigation and Defendants' unsuccessful attempt to narrow Berland's ERISA claims,

Defendants abruptly changed course, belatedly asserting that Berland must arbitrate her two state-law claims under a Dispute Resolution Agreement she signed in 2016.

As the District Court recognized, the basic problem with Defendants' motion to compel arbitration is that 2018, 2019, 2020, 2021, and 2022—the years of the Award Agreements—occurred after 2016—the year Berland signed the Dispute Resolution Agreement. That matters because, as this Court held in *Suski v. Coinbase*, 55 F.4th 1227 (9th Cir. 2022), when parties enter into two contracts at different times and the later-in-time agreement contains a forum-selection clause that is inconsistent with arbitration being the exclusive venue for resolving disputes, this later contract displaces whatever prior agreement the parties may have had requiring arbitration of those claims. That is just what happened here: The parties acknowledged five times between 2018 and 2022 that there could be litigation arising from the Award Agreements. They explicitly agreed that such litigation would take place in California courts and consented to those courts' jurisdiction. Those 2018–2022 Award Agreements are manifestly inconsistent with Defendants'

belated argument that Berland's claims based on the Award Agreements actually must be arbitrated because of an agreement she signed years earlier.

Because this Court's decision in *Suski* compels the Court to enforce the forum-selection clause in the parties' 2018–2022 contracts, Defendants' appeal can only succeed if they convince the Court that this case is different from *Suski*. They make two attempts to do so. First, they argue the language of the forum-selection clause in the 2018–2022 Award Agreements is fully consistent with arbitration being the exclusive means of resolving disputes arising from those agreements. This Court rejected the same argument in *Suski* and should do so again here. On Defendants' interpretation, no litigation arising under the Award Agreements is possible, because all such disputes would have to be arbitrated under the pre-existing Dispute Resolution Agreement. Defendants' interpretation of the Award Agreements' forum-selection clauses makes those clauses superfluous, so it must be rejected under basic rules of contract law.

Second, Defendants try to evade *Suski* by misrepresenting the facts of this case. They claim that the five Award Agreements Berland and Twitter

signed between 2018 and 2022 must be treated as though they predated the 2016 Dispute Resolution Agreement because, in approximately 2013, Twitter's lawyers drafted *a sample* award agreement that contained the same forum-selection clause later found in the Award Agreements Berland and Twitter would sign between 2018 and 2022. But what matters is when Berland and Twitter *agreed to* the Award Agreements, not when someone drafted an unexecuted, non-binding sample contract with similar terms. That indisputably happened in 2018, 2019, 2020, 2021, and 2022. Because the Award Agreements only became binding on Berland and Twitter with the execution of those agreements years after the 2016 Dispute Resolution Agreement, they are plainly subsequent contracts that supersede the 2016 contract. This case fits *Suski* to a T.

Finally, even if Defendants had a right to arbitrate under the Award Agreements, Defendants long ago waived that purported right. Again and again, Defendants told the District Court that Berland's state-law claims should be resolved in court. They even went so far as to tell the District Court that this case was not suitable for arbitration and that Berland was entitled

5

to a jury trial on her state-law claims. They repeatedly identified disputed issues in the case and previewed the motions they planned to file, but never said anything at all about arbitration until they failed in their attempt to prune some of Berland's ERISA claims. Defendants' regret that they lost their motion to dismiss does not excuse their willing and intentional waiver of any contractual right to arbitrate.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Counts One and Two of Berland's complaint assert claims arising under federal law, while Counts Three and Four assert state-law claims related to those federal claims. *See* 3-ER-373–376 (¶¶ 202–220). The District Court denied Defendants' motion to compel arbitration of Counts Three and Four on July 25, 2025. 1-ER-2–10. Defendants appealed that decision on August 20, 2025. 3-ER-378–79. This Court has jurisdiction over the appeal under 9 U.S.C. § 16(a)(1)(A).

## STATEMENT OF THE ISSUES

1.  Did the District Court correctly deny Defendants' motion to compel arbitration of two state-law claims alleging that Defendants Musk, X Corp., and X Holdings breached five equity award agreements signed between 2018 and 2022 when the parties "submit[ted] to and consent[ed] to the jurisdiction of the State of California . . . [f]or purposes of litigating any dispute that arises under" those agreements and "agree[d] that such litigation will be conducted in" California court?

2.  Did Defendants waive their purported right to arbitrate by telling the District Court that the case was not suitable for arbitration and that Berland's state-law claims should be resolved in court, participating in discovery, and failing to raise their purported arbitration right until after they had lost their legal challenge to some of Berland's claims?

## STATEMENT OF THE CASE

In 2016, Leslie Berland joined Twitter and signed a Dispute Resolution Agreement requiring arbitration of employment-related disputes. Between 2018 and 2022, Berland and Twitter entered into five equity Award

Agreements in which they agreed that California courts would have "juris-diction . . . for the purposes of litigating any dispute that ar[o]s[e] under" those contracts and agreed "that such litigation will be conducted in" those courts. After Musk purchased Twitter and fired Berland, purportedly "for Cause," she brought this lawsuit, which included two claims for breach of the Award Agreements. After repeatedly disclaiming any right to arbitrate, taking part in discovery, and failing in their bid to dismiss one of Berland's other claims, Defendants belatedly moved to compel arbitration of those two counts. The District Court denied Defendants' motion, and they now appeal.

## I.   Berland joined Twitter in 2016 and signed a Dispute Resolution Agreement.

In January 2016, Plaintiff-Appellee Leslie Berland accepted Twitter, Inc.'s offer to become the company's Chief Marketing Officer. 2-ER-285–88 ("Offer Letter"). The Offer Letter defined some of Berland's roles and re-sponsibilities and set the details of her compensation. 2-ER-285 (¶¶ 2–4). It also advised that Twitter's Board of Directors had approved Berland's par-ticipation in a "Change of Control and Severance Policy," which would en-title her to certain benefits described in that policy if she were terminated

8

without cause during a "Change of Control Period." 2-ER-286 (¶ 9). Finally, the Offer Letter had a "Dispute Resolution" clause providing that if "a dispute should arise, it can be resolved through the Company's Dispute Resolution Agreement," which was attached "for [her] signature." 2-ER-288 (¶ 14). The Offer Letter exempted disputes "arising out of or related to the Severance Policy" from the Dispute Resolution Agreement's scope. *Id.*

The separate Dispute Resolution Agreement mentioned in Berland's Offer Letter provided that it would apply "to any dispute arising out of or related to [her] employment with Twitter." 2-ER-290–93 (¶ 1). It specified that such disputes would be resolved "through final and binding arbitration and not by way of court or jury trial." *Id.* The Dispute Resolution Agreement explained, however, that agreeing to arbitration was "not a mandatory condition of [an] Employee's employment at [Twitter]" and that employees could "opt out and not be subject to" the Dispute Resolution Agreement by submitting an opt-out form. 2-ER-292 (¶ 8). Berland signed the Dispute Resolution Agreement on February 1, 2016, when she started her employment.

2-ER-293. Although other Twitter employees opted out of the Dispute Resolution Agreement,[1] Berland never did so.

Berland's Offer Letter also mentioned that "[s]ubject to the approval of [Twitter's] Board of Directors," she may be granted equity in the company. 2-ER-286 (¶ 8). The Offer Letter said that these future awards would "be subject to the terms and conditions set forth in [Twitter's] 2013 equity plan and the applicable . . . award agreements." 2-ER-287 (¶ 8). The Offer Letter also advised that the terms of Twitter's equity plans "are reviewed periodically, and subject to revision at [Twitter's] sole discretion." *Id.* Defendants presented no evidence that Berland was shown a copy of Twitter's 2013 Equity

---

[1] In successfully opposing a motion for class certification in another case, X Corp. argued that the proposed class representative was inadequate because he opted out of the Dispute Resolution Agreement. *See* Decl. of Aoife Fenlon ¶¶ 1, 2, 8, *Schobinger v. Twitter, Inc.*, No. 3:23-cv-3007 (N.D. Cal. Sept. 17, 2024), ECF No. 86 ("I have worked at X Corp. for more than two years. . . . In my capacity as a Senior Manager, People Operations, I regularly work with X's Human Resources systems that contain information and data regarding X's employees, including . . . whether they signed a Dispute Resolution Agreement ('DRA'), and if so, whether they subsequently opted out of the DRA, among other things. . . . According to X's records, of the approximately 1,221 active U.S. employees as of March 3, 2023, there are approximately 59 employees (i.e., less than 5%) who are not subject to the DRA.").

Incentive Plan ("2013 Equity Plan") in early 2016 when she signed her Offer Letter and the Dispute Resolution Agreement.

Defendants produced a copy of the 2013 Equity Plan in discovery. 2-ER-33–50. It does not have any dispute-resolution, venue, or forum-selection clause. *Id.* It specified that any awards under the plan would be "evidenced by an Award Agreement" that would specify the "terms and conditions, as the Administrator"—namely, Twitter's Board or Directors or a Committee of the Board—"in its sole discretion, will determine." 2-ER-43 (¶ 7(b)); *see also* 2-ER-33 (¶ 2(d)) (defining "Award Agreement"); 2-ER-39 (¶ 4(b)(iv)–(v)) (discussing the administrator's power to approve any Award Agreements and "determine the[ir] terms and conditions"). In discovery, Defendants also produced two sample award agreements, which they claim were attached to the 2013 Equity Plan. 2-ER-51–103. Twitter's SEC filing disclosing the 2013 Equity Plan called these documents "related" form agreements, not part of the 2013 Equity Plan itself. 2-SER-363. Those form agreements had a "Governing Law and Venue" clause, providing:

> This Award Agreement will be governed by the laws of Delaware, without giving effect to the conflict of law principles

thereof. For purpose of litigating any dispute that arises under this Option or this Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of the County of San Francisco, California, or the federal courts for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed.

2-ER-88 (¶ 24). These sample agreements are entirely blank as to their award details and include unexecuted signature lines for both Twitter and a participant in the 2013 Equity Plan. *See* 2-ER-78–79. Defendants presented no evidence that Berland signed or in some other way agreed to these sample award agreements when she joined Twitter in 2016.

## II. Between 2018 and 2022, Berland and Twitter entered into five equity award agreements requiring litigation of claims arising under the award agreements in California court.

In May 2018, Twitter awarded Berland restricted stock options under the 2013 Equity Plan. 2-ER-136–48. Consistent with the Plan's terms, this award was effectuated by an Award Agreement signed by Berland and Twitter's then-Chief Financial Officer. 2-ER-136–37. Attached to this 2018 Award Agreement was an "Exhibit A" setting forth the "Terms and

Conditions" of the stock award. 2-ER-139–48. Among other terms, it had a "Governing Law and Venue" clause:

> This Award Agreement will be governed by the laws of Delaware without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Award of Restricted Stock Units or this Award Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of the County of San Francisco, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed.

2-ER-148 (¶ 24). The Award Agreement also had an integration clause, explaining that the 2013 Equity Plan "and this Award Agreement constitutes the entire understanding of the parties on the subjects covered." 2-ER-148 (¶ 26). And it had a provision captioned "Award Agreement Governs," which established that "[i]n the event of a conflict between one or more provisions of this Award Agreement and one or more provisions of the Plan, the provisions of the Award Agreement will govern." 2-ER-146 (¶ 17).

Berland and Twitter went on to sign four more equity award agreements in March 2019, April 2020, April 2021, and April 2022. *See* 2-ER-150–61; 2-ER-163–98; 2-ER-200–35; 1-SER-13–54. These Award Agreements had

the same "Governing Law and Venue" clause, integration clause, and conflict clause found in the May 2018 Award Agreement. *See* 2-ER-159, 161 (¶¶ 17, 24, 26); 2-ER-173–74 (¶¶ 17, 24, 26); 2-ER-210–12 (¶¶ 17, 24, 26); 1-SER-24–26 (¶¶ 17, 24, 26). But in other respects, the Award Agreements' terms vary. *Compare, e.g.*, 2-ER-203 (¶ 3) *with* 2-ER-139 (¶ 3) (adding additional provisions regarding the vesting of awards not found in the May 2018 Award Agreement). The five Award Agreements also *differ* from the sample award agreement purportedly attached to the 2013 Equity Plan. *Compare, e.g.*, 2-ER-140–42 (¶ 7) *with* 2-ER-81–82 (¶ 7) (adding a provision regarding the UK tax consequences that was not found in the blank sample agreement).

### III.   Berland sued Defendants after they refused to honor her equity awards and other employment benefits following her termination from Twitter.

Berland's tenure as Twitter's CMO was remarkably successful, leading to her being named to *Forbes*' "World's Most Influential CMOs" list for five straight years and inducted into *Forbes*' "CMO Hall of Fame." 2-ER-332 (¶ 3). But in the later years of her tenure, the world's richest man, Elon Musk, was locked in a dispute with Twitter over his purchase of the company. *See*

2-ER-346 (¶¶ 47–50). That dispute began when Musk made an offer to purchase Twitter at a significant premium above its market price. *Id.* Musk soon had second thoughts and tried to back out of the agreement, which led to Twitter suing him in Delaware to enforce the agreement. 2-ER-346 (¶ 50). Following months of heated litigation, Musk finally yielded, closing on his purchase of Twitter according to the original terms of the deal on October 27, 2022. *Id.*

Musk's failed effort to back out of his deal with Twitter left him with significant animosity toward Twitter's leadership, whom he blamed for forcing him to close the deal. To get even, he hatched a plan to fire Twitter's senior executives and to deprive them of their employment benefits, including millions of dollars in severance and equity payments. 2-ER-333–34 (¶¶ 5–6); 2-ER-347 (¶¶ 52–57). As part of that scheme, upon assuming control of Twitter, Musk immediately fired most of Twitter's senior leadership, claiming that they were being fired "for Cause" so that he could refuse to pay them their benefits under Twitter's severance policies. *Id.*

15

At first, Berland was spared from Musk's retributive firing spree. When Musk arrived at Twitter's headquarters in October 2022, Berland choreographed a series of meetings for Musk and his team. 2-ER-334–35 (¶ 7); 2-ER-348–49 (¶¶ 58–70). Over the following days, she earned nothing but praise from Musk and his allies for her handling of the leadership transition. *Id.* But things soon went awry after Berland recommended that Twitter's Head of Global Sales, JP Maheu, attend a meeting between Musk and many of Twitter's largest advertisers. 2-ER-349–50 (¶¶ 71–75). During that meeting, Maheu upset Musk by challenging one of his suggestions. 2-ER-350 (¶ 76). Just hours later, Musk texted Berland that JP Maheu was a "[b]ad recommendation," and fired her without any other explanation. 2-ER-350 (¶¶ 76–77).

Musk and his team thereafter implemented the same plan to deprive Berland of her employment benefits that they had used against the rest of Twitter's management team a week earlier. Nearly a month after her firing, Berland received a letter informing her that she had been terminated "for Cause," but the letter did not identify what conduct supposedly constituted

"Cause" to fire her. 2-ER-351 (¶¶ 81–82). When Berland submitted a claim for benefits under a company severance plan, Defendants subjected her to a sham process, inventing various post-hoc justifications for her termination as a ploy to deny Berland the benefits she is owed. *See* 2-ER-352–68 (¶¶ 84–180).

Berland responded by filing this lawsuit in the Northern District of California against Musk, Twitter (later renamed "X Corp."), and various defendants involved in Musk's and X Corp.'s wrongful denial of her employment benefits. *See* 2-ER-340–42 (¶¶ 15–27) (identifying parties involved). Her operative complaint asserts four causes of action. Counts One and Two raise claims under ERISA, seeking the severance benefits provided for in the change-of-control severance plan and other relief. *See* 2-ER-373–75 (¶¶ 202–11). Count Three alleges a claim for breach of contract based on Musk, X Holdings, and X Corp.'s failure to pay her the cash equivalent of the restricted stock options she was awarded under the five Award Agreements she and Twitter signed between 2018 and 2022. *See* 2-ER-375 (¶¶ 212–16). Count Four asserts a claim for breach of the covenant of good faith and fair

dealing based on Musk, X Holdings, and X Corp.'s failure to honor those same Award Agreements. 2-ER-375–76 (¶ 217–20).

## IV. After repeatedly telling the District Court that Berland's state-law claims should be resolved in court, Defendants reversed course and belatedly moved to compel arbitration of Counts Three and Four.

For seven months, Defendants took part in Berland's suit in a way inconsistent with their claimed right to arbitrate Berland's state-law claims. They moved to dismiss one of the ERISA counts—Count Two—arguing that it failed to state a claim. *See* 2-ER-310–29. Nowhere in their motion did Defendants assert that there was any reason why the parties should not proceed with litigation on the other three counts, including the two state-law claims based on the Award Agreements. *See id.*

Consistent with their position that Counts One, Three, and Four should proceed in court regardless of the outcome of Defendants' motion to dismiss Count Two, the parties soon filed a Joint Case Management Statement. *See* 2-ER-294–308 ("Joint Statement"). In the Joint Statement, the parties identified seven legal issues they disputed. *See* 2-ER-301–02 (¶ 3). One of those disputed issues was "whether Defendants breached" their Award

Agreements with Berland. *Id.* Defendants did not identify the arbitrability of those claims as an issue. *Id.*

Defendants also discussed the motions they "anticipate[d]" they would file over the course of the case. 2-ER-302 (¶ 4). Those anticipated motions included "cross motions/briefing under Rules 52 and/or 56 as to the benefits claims [Counts One and Two] *as well as the other claims* [Counts Three and Four]." *Id.* (emphasis added). Defendants thus told the District Court they would be asking it to decide the merits of Berland's claims. They did not identify a motion to compel arbitration as one of the motions they expected to file.

Next, the parties detailed an agreed-upon motion and discovery schedule. 2-ER-303–04, 305–06 (¶¶ 8, 16). Under that schedule, fact discovery would conclude by November 2025. *Id.* Once again, Defendants said nothing about any purported right to arbitrate some of Berland's claims. *See id.* They likewise did not ask the court to stay discovery on these supposedly arbitrable claims, instead agreeing to a schedule that provided for discovery to proceed on them expeditiously. *See id.*

The Joint Statement also asked the parties to inform the court whether they believed the case may be suitable for resolution in another forum. On that topic, Defendants said that "[t]he parties *do not believe that the case is suitable for reference to binding arbitration*, a special master, or the Judicial Panel on Multidistrict Litigation." 2-ER-305 (¶ 13) (emphasis added).

Finally, regarding the ultimate trial, Defendants informed the District Court that they "believe[d] that most, *if not this entire case should be adjudicated through Rule 52 motions*." 2-ER-306 (¶ 17) (emphasis added). Nowhere did they suggest that they believed half of Berland's claims actually needed to be settled by an arbitrator.

Shortly after the parties filed this Joint Statement, they appeared before the District Court for an initial conference. Defendants' counsel never suggested during the conference that they might move to compel arbitration of any of Berland's claims. *See* 1-SER-56–70. To the contrary, Defendants' counsel explicitly acknowledged that discovery had begun and should continue on Counts Three and Four of the complaint. 1-SER-63–64 (8:18–9:13). Their counsel further confirmed that Defendants had agreed to the discovery and

20

motions schedule proposed in the parties' Joint Statement. 1-SER-66 (11:6–12). Finally, when questioned by the District Court about Berland's right to a jury trial, Defendants' counsel conceded that Berland had a right to a jury trial on Counts Three and Four of her complaint:

> THE COURT: All right. But here, Mr. Rudolph, on page 13, line 12, you said, "Plaintiff has no right to a jury trial." But that's not correct, right?
>
> MR. RUDOLPH: On -- on the ERISA claims, your Honor, yeah. It's just that this -- to clarify that on the -- we would just want to make it clear that there's no right to a jury trial, with respect to counts one and two.
>
> THE COURT: Yeah, for sure.
>
> MR. RUDOLPH: Yeah.
>
> THE COURT: But definitely on the contract and –
>
> MR. RUDOLPH: Correct.
>
> THE COURT: -- good faith claim. Okay.
>
> MR. RUDOLPH: Right.

2-SER-68 (13:9–21). Defendants thus repeatedly told both the District Court and Berland that they believed the entirety of this case should be resolved in court and that Counts Three and Four should be decided through summary judgment motions or, if necessary, by a jury.

21

Over the following months, Defendants continued to act as though all Berland's claims would be proceeding in court, not in arbitration. On January 30, they served their Rule 26 Initial Disclosures, which identified documents in their possession relevant to Counts Three and Four of the complaint. *See* 1-SER-75. In March, according to the discovery schedule Defendants had agreed to, Berland served her initial requests for production and interrogatories, which included requests relevant to Counts Three and Four. *See* 1-SER-121–23 (Requests No. 55–58). Although Defendants objected to these and other discovery requests on various grounds, they never objected that discovery on these subjects was improper because these claims could be decided only in arbitration. *See* 1-SER-80–86; 1-SER-121–23.

The first time Defendants or their counsel said the word "arbitration" in this case was in May 2025, seven months after the complaint was filed and two weeks after the Court denied their motion to dismiss Count Two. *See* 1-SER-2–11. Specifically, on May 9, they moved to compel arbitration of

Counts Three and Four of Berland's complaint. *See* 2-ER-266–93.[2] In support of their motion, Defendants relied exclusively on the plain text of the parties' Dispute Resolution Agreement. *See* 2-ER-276–77; 2-ER-283. Specifically, Defendants submitted only Berland's Offer Letter and the copy of the Dispute Resolution Agreement she signed in February 2016. 2-ER-283. Defendants did not provide—and their motion in no way discussed—the Award Agreements themselves. Nor did they present any facts regarding the signing of Berland's Offer Letter and the Dispute Resolution Agreement, such as by attesting to the facts or circumstances regarding the signing of those agreements or identifying specific documents that were provided to Berland to review as part of her acceptance of Twitter's Offer Letter.

Berland responded by presenting the Court with the Award Agreements—the bases for Counts Three and Four of the complaint. *See* 2-ER-136–235; 1-SER-13–51. She argued that those agreements clearly gave California courts "jurisdiction" over "any dispute that ar[o]s[e] under" those

---

[2] The parties agree that Counts One and Two are not arbitrable, given the express carve out from the Dispute Resolution Agreement. 2-ER-288 (¶ 14).

agreements. 2-ER-119–25. She also summarized the long history of Defend-

ants' participation in this suit in a manner inconsistent with any agreement

to arbitrate and argued that Defendants waived any purported right to com-

pel arbitration. *See* 2-ER-125–29.

In their reply, Defendants contended that the Dispute Resolution

Agreement signed in 2016 somehow displaced the Award Agreements the

parties signed between 2018 and 2022. 2-ER-21–24. In doing so, the only ad-

ditional evidence Defendants presented was a copy of the 2013 Equity Plan

they had produced in discovery, which included two sample award agree-

ments as purported attachments. *See* 2-ER-33–103. As before, Defendants

presented no actual evidence—such as witness affidavits—attesting to the

circumstances regarding Berland's signing of her Offer Letter in 2016. They

thus provided no evidence that Berland even saw the 2013 Equity Plan at

that time, much less that she reviewed it and somehow assented to it or the

sample award agreements that are not even a part of the 2013 Equity Plan.

*See* 2-ER-31 (declaration from counsel simply attesting to existence of docu-

ment); 2-SER-363 (SEC filing providing a "Description" of the document

Defendants produced as "Twitter, Inc. 2013 Equity Incentive Plan *and related form agreements*") (emphasis added).

Following oral argument, the District Court denied Defendants' motion to compel arbitration of Counts Three and Four. *See* 1-ER-2–10. After summarizing the relevant facts regarding the parties' agreements, 1-ER-2–5, the District Court turned to this Court's decision in *Suski v. Coinbase, Inc.*, 55 F.4th 1227 (9th Cir. 2022), finding that decision "dispositive," 1-ER-5–8. In *Suski*, this Court held that when a forum-selection clause in a later contract is "inconsistent" with an arbitration clause in a prior contract between the parties, the later contract "prevails" over the prior arbitration agreement. 1-ER-5–6. Just as in *Suski*, Berland and Twitter signed the Dispute Resolution Agreement providing for arbitration. But years later, they signed the Award Agreements, all of which "unambiguously provide [that] 'any dispute' that arises under the Agreements shall be litigated in California state or federal court." 1-ER-5. Because the 2018–2022 Award Agreements were inconsistent with the 2016 Dispute Resolution Agreement, those later agreements controlled. 1-ER-6-7. The District Court further noted that the Award

Agreements had integration clauses providing that they represented the entire understanding of the parties on the subjects covered, one of which was the jurisdiction of courts to resolve claims arising from the Award Agreements. 1-ER-7. The District Court found Defendants' cursory efforts to distinguish *Suski* unpersuasive and rejected their reliance on various district-court decisions where the parties entered into a single contract that contained arguably inconsistent arbitration and forum-selection clauses, finding those cases inapplicable to a case like this one involving multiple contracts. *See* 1-ER-6–8. The District Court found it unnecessary to address issues of Delaware law, which governs the Award Agreements, concluding that Defendants could not prevail even under the California law they cited in their motion to compel arbitration. 1-ER-6 (n.2).

Defendants appealed the District Court's decision. 3-ER-378–79. In the meantime, litigation is ongoing in the District Court on Counts One and Two of Berland's complaint, which all agree are not subject to arbitration.

26

## SUMMARY OF THE ARGUMENT

As this Court and courts around the country have repeatedly recognized, when parties enter into an agreement containing a forum-selection clause that is inconsistent with arbitration as the exclusive means for resolving their disputes, that later contract displaces any prior agreements purportedly requiring arbitration of the dispute. *Suski v. Coinbase, Inc.*, 55 F.4th 1227 (9th Cir. 2022). That perfectly describes the situation here: When Berland accepted Twitter's offer of employment in early 2016, she agreed to arbitrate employment-related disputes. But years later, Twitter awarded Berland equity in the company. The terms of those grants were set by contracts Berland and Twitter signed in 2018, 2019, 2020, 2021, and 2022. Each of those subsequent contracts provided that "[f]or purposes of litigating any dispute that arises under" each Award Agreement, "the parties hereby submit to and consent to the jurisdiction of the State of California, and *agree that such litigation will be conducted in the courts of the County of San Francisco, California, or the federal courts for the United States for the Northern District of California*." The parties thus explicitly recognized that litigation may "arise under" the

27

Award Agreements. And they agreed that such litigation would proceed in California courts. This agreement that disputes about the Award Agreements would be settled in court is plainly inconsistent with arbitration being the exclusive means to resolve any employment-related disputes. And that is particularly so because the Award Agreements have integration clauses stating that they are the parties' entire understanding on the "subjects covered" by the Award Agreements. One of those "subjects" is how disputes about the Award Agreements will be resolved. Berland's claims for breach of those Award Agreements thus must be resolved in California court. *See infra* at 33–43.

Defendants make two arguments to try to avoid the 2018–2022 Award Agreements and force Berland to arbitrate her claims under the 2016 Dispute Resolution Agreement. First, they contend that the Award Agreements are not actually inconsistent with the Dispute Resolution Agreement, because the Award Agreements can be understood to specify only where litigation is to take place *if* it should take place at all. But that interpretation makes the Award Agreements' forum-selection clause superfluous: On Defendants'

28

telling, there *cannot be* litigation "aris[ing] from" the Award Agreements because any dispute about those agreements must be settled through arbitration. Defendants' interpretation of the Award Agreements means that they do nothing. Basic rules of contract interpretation and this Court's precedent foreclose that approach. *See infra* at 43–52.

Defendants' other argument relies on misleading the Court about the facts. They claim that the forum-selection clauses found in the 2018–2022 Award Agreements were really part of a "2013 Equity Plan" mentioned in Berland's 2016 Offer Letter. As a result, they claim that the contracts Berland and Twitter signed between 2018–2022 must be treated as part of the same transaction through which she accepted Twitter's offer of employment in 2016. This assertion is contrived and false: The 2013 Equity Plan has no forum-selection, venue, or dispute-resolution clause at all. Rather, Defendants point to a *sample* equity award agreement under the 2013 Equity Plan, which purportedly existed before 2016 and has the same forum-selection clause found in the Award Agreements Berland and Twitter would later sign between 2018 through 2022. But what matters is when the parties *agreed to* a

contract, not when one side's lawyers drafted its language. Defendants have produced no evidence that Berland ever *saw* this sample award agreement when she accepted Twitter's offer of employment. And they have provided no evidence that she and Twitter somehow *agreed to that provision* in 2016. Berland and Twitter only agreed to that provision in connection with each equity award years later, when they signed the *actual* Award Agreements that governed each award. Because the contracts Berland and Twitter signed in 2018, 2019, 2020, 2021, and 2022 are inconsistent with and postdate the signing of the Dispute Resolution Agreement in 2016, the Award Agreements are plainly not part of some 2016 deal. *See infra* at 53–60.

Finally, Defendants long ago abandoned their purported right to arbitrate. They responded to Berland's lawsuit not by seeking arbitration, but by moving to dismiss one of her claims on the merits. Then they told the District Court that this case was not amenable to arbitration, that "this entire case should be adjudicated through Rule 52 motions," that Berland had a right to a jury trial on her state-law claims, and that discovery should proceed expeditiously on all of Berland's claims. It was only after they lost their motion

to dismiss that Defendants changed course and decided to invoke their purported arbitration rights. Waiver doctrine forecloses such gamesmanship, precluding Defendants from compelling arbitration after litigating this case for months. *See infra* at 61–70.

## STANDARD OF REVIEW

This Court reviews the District Court's decision denying Defendants' motion to compel arbitration de novo. *See, e.g., Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1229 (9th Cir. 2022). In doing so, this Court "can affirm on any ground supported by the record, including a ground upon which the district court did not rely." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (internal quotation marks omitted); *accord Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020).

"When determining whether parties have agreed to submit to arbitration, courts apply state-law principles of contract formation and interpretation." *Suski*, 55 F.4th at 1230. An agreement to arbitrate "will not be inferred absent a clear agreement." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014) (internal quotation marks omitted). Under the Federal Arbitration

31

Act, the party "seeking to compel arbitration has the burden . . . to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). Defendants thus have "the burden of proving the existence of an agreement to arbitrate" Counts Three and Four of Berland's complaint "by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). And "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration," this Court does not apply any "presumption in favor of arbitrability" to disputes, like this one, "concerning whether an agreement to arbitrate has been made." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014) (internal quotation marks omitted).

## ARGUMENT

## I.     The District Court correctly denied Defendants' motion to compel arbitration of Counts Three and Four.

This Court has already decided that when parties first enter into a general arbitration agreement but then agree to a later contract containing a forum-selection clause that is inconsistent with mandatory arbitration, the

32

later agreement controls. *See Suski*, 55 F.4th 1227. *Suski* is on all fours with this case and controls its outcome, just as the District Court recognized. *See infra* at 33–43. Defendants' assertion that the Award Agreements' forum-selection clause is consistent with mandatory arbitration is refuted by the plain words of the clause and would make it superfluous, violating bedrock rules of contract interpretation. *See infra* at 43–52. Defendants try to distinguish *Suski*, arguing that under California law the 2018–2022 Award Agreements must be treated as part of the same contractual undertaking as the 2016 Dispute Resolution Agreement. But the five Award Agreements the parties signed between 2018 and 2022 were executed well after the Dispute Resolution Agreement was executed in 2016, so they cannot be treated as part of the same contract as the Dispute Resolution Agreement. *See infra* at 53–60.

## A. This case is just like *Suski*.

As the District Court recognized in its decision, this Court's decision in *Suski* "is dispositive." 1-ER-6. In *Suski*, certain users of the Coinbase trading platform signed a "User Agreement" when they created their Coinbase accounts. 55 F.4th 1228. That user agreement had an arbitration provision.

*Id.* But later, Coinbase promoted a "Dogecoin Sweepstakes," which was governed by some "Official Rules." *Id.* Those rules provided:

> The California courts (state and federal) shall have sole jurisdiction of any controversies regarding the promotion and the laws of the State of California shall govern the promotion. Each entrant waives any and all objections to jurisdiction and venue in those courts for any reason and hereby submits to the jurisdiction of those courts.

*Suski v. Marden-Kane, Inc.*, 2022 WL 103541, at *3 (N.D. Cal. Jan. 11, 2022), *aff'd sub nom. Suski v. Coinbase*, 55 F.4th 1227 (capitals omitted). The users believed that Coinbase violated California law in how it conducted the sweepstakes, so they sued in California federal court. 55 F.4th at 1228. Coinbase moved to compel arbitration of the lawsuit, pointing to the arbitration clause in the User Agreement. *Id.* at 1229. But the district court denied the motion, finding that the Official Rules' forum-selection clause displaced the arbitration provision of the User Agreement. *Id.*

This Court unanimously affirmed. Under California law, which governed the Official Rules, "when parties enter into a second contract dealing with the same subject matter as their first contract without stating whether the second contract operates to discharge or substitute the first contract, the

34

two contracts must be interpreted together and the latter contract prevails to the extent they are inconsistent." 55 F.4th at 1231 (internal quotation marks omitted). While the later Official Rules did not explicitly revoke or even refer to the User Agreement's arbitration clause, by "including the forum selection clause" in the Official Rules the parties "evince[d] [their] intent not to be governed by the User Agreement's arbitration clause when addressing controversies concerning the sweepstakes." *Id.* at 1230. After all, the Official Rules recognized that "controversies" may arise from the sweepstakes, and the parties agreed that California courts should have "jurisdiction" over those controversies. The parties' explicit agreement that California courts should have jurisdiction over disputes about the sweepstakes was thus inconsistent with their earlier agreement that all disputes must be settled through arbitration, so the forum-selection clause of the later agreement must control. *Id.*

*Suski* also addressed and rejected Coinbase's argument that the forum-selection clause of the Official Rules "can and should be read harmoniously" with the earlier arbitration agreement by limiting the forum-selection clause

35

"only to non-arbitrable claims and to suits seeking enforcement of any arbitration awards." *Id.* That narrow interpretation of the forum-selection clause proffered by Coinbase (and here by Defendants) might have been permissible if the clause was part of the *same contract* as the one containing the arbitration clause. *See id.* But when parties enter into "an original contract and a subsequent contract," the terms of that subsequent contract must be given their ordinary meaning. *Id.* The Official Rules' forum-selection clause's actual words in no way suggested it was limited to non-arbitrable claims or litigation about arbitration—the Official Rules said nothing about arbitration at all—so the Court could not give the later agreement's forum-selection clause the unnaturally narrow interpretation Coinbase proposed.[3]

---

[3] *Suski* also decided that the court, not an arbitrator, must decide whether the forum-selection clause in the Official Rules "superseded the arbitration clause in the User Agreement." 55 F.4th at 1229. The Supreme Court granted certiorari as to that issue and unanimously affirmed this Court's decision. *See Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024). That aspect of *Coinbase* is not at issue in this appeal because all agree that courts must decide the arbitrability of Berland's claims.

This case is just like *Suski*. In 2016, Berland and Twitter signed a Dispute Resolution Agreement in which they agreed to arbitrate "any dispute arising out of or related to" her employment. 2-ER-290 (¶ 1). But in 2018, Berland and Twitter signed an "Award Agreement" conferring on her certain equity awards. 2-ER-136–38. Attached to that Award Agreement was an exhibit that provided the "Terms and Conditions" of the equity grant. 2-ER-139–48. Those "Terms and Conditions" included the parties' agreement that

> [t]his Award Agreement will be governed by the laws of Delaware without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Award of Restricted Stock Units or this Award Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of the County of San Francisco, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed.

2-ER-148 (¶ 24). Berland and Twitter later entered into Award Agreements in 2019, 2020, 2021, and 2022 with identical provisions. 2-ER-148 (¶ 24); 2-ER-161 (¶ 24); 2-ER-174 (¶ 24); 1-SER-25 (¶ 24).

Just like the forum-selection clause in *Suski*, the forum-selection clause in the Award Agreements recognized that disputes may "arise[] under" the

Award Agreements. Just like in *Suski*, the parties recognized that those disputes might be "litigat[ed]." And just like in *Suski*, they "*agree*[*d*] that such litigation *will be conducted* in" state or federal courts in California and they "submit[ted] to and consent[ed] to the jurisdiction" of those courts for the purposes of litigation. Defendants thus agreed that "litigation" that "arises under" the Award Agreements "will be conducted" in California courts and they "submit[ted] to and consented to the jurisdiction" of those courts. Defendants' express agreement that California courts have jurisdiction over claims arising under the Award Agreements is plainly inconsistent with arbitration being the exclusive forum for resolving any dispute between Berland and Twitter. So just as in *Suski*, the parties' 2018, 2019, 2020, 2021, and 2022 Award Agreements dictate that California courts are the appropriate forum for Berland's claims that Musk, X Holdings, and X Corp. breached the Award Agreements.

Indeed, as the District Court recognized, this case is even simpler than *Suski*. Unlike the second contract in *Suski* (the Official Rules), the later contracts in this case (the Award Agreements) had integration clauses. Those

38

clauses provided that the 2013 Equity Plan "and this Award Agreement constitutes the entire understanding of the parties *on the subjects covered*." 2-ER-148 (¶ 26) (emphasis added). One of the "subjects covered" by the Award Agreement was how and where disputes "that arise[] under" the Award Agreements would be resolved: The parties "submit[ted] to and consent[ed] to the jurisdiction of the State of California, and agree[d] that such litigation will be conducted in" its courts. 2-ER-148 (¶ 24). Because the Award Agreements say nothing at all about disputes being settled *through arbitration*, Defendants cannot claim that the parties actually understood that disputes about the Award Agreements would be settled in that forum. And because the Award Agreements deal directly with the subject of how disputes will be resolved and have integration clauses, they displace all prior agreements between the parties on that topic, including the Dispute Resolution Agreement.

Because this Court's prior decision in *Suski* resolves this appeal, this Court needs look no further than that case. But were it to do so, it would see that *Suski* is hardly alone in holding that a forum-selection clause in a later

contract displaces an arbitration clause in an earlier agreement. Delaware law, which governs the Award Agreements, 2-ER-148 (¶ 24), recognizes the same principle that forum-selection clauses in subsequent contracts displace arbitration clauses in earlier agreements. *See, e.g., Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ct. Ch. Jan. 31, 2007) (explaining that a "new contract, as a general matter, will control over the old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract"). And in cases like this one, where the parties enter into a subsequent contract that addresses how disputes will be resolved and that contains an integration clause, the later contract displaces any dispute-resolution clause of an earlier agreement. *See, e.g., Green Isle Partners, Ltd. v. Ritz-Carlton Hotel Co. L.L.C.*, 2000 WL 1788655, at *4 (Del. Ct. Ch. Nov. 29, 2000) (holding that the integration clause of a later contract "preclude[d] the application of the forum selection clause contained" in an earlier contract). Thus, whether one looks to the law of the forum (California) or the law chosen by the parties (Delaware), the Award Agreements' forum-

selection clauses displace the Dispute Resolution Agreement they signed years earlier.

This Court's federal peers have reached the same result as *Suski*. The Second Circuit, for example, has repeatedly held that "an agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause specifically precludes arbitration." *Res. Grp. Int'l Ltd. v. Chisti*, 91 F.4th 107, 114 (2d Cir. 2024) (internal quotation marks omitted). As those decisions explain, however, an agreement need not even *mention* arbitration in order to "specifically preclude" it. Rather, a later agreement's forum-selection clause "specifically precludes" arbitration so long as its terms are inconsistent with arbitration being the exclusive way of resolving disputes. *Id.* (holding that a later agreement giving New York courts "jurisdiction" over certain disputes displaced an earlier agreement to arbitrate even though the later agreement "did not explicitly discuss arbitration" and citing cases); *accord Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 215–26 (2d Cir. 2014). The Tenth Circuit has done the same. *See Summit Contractors, Inc. v. Legacy Corner, LLC*, 147 F. App'x 798, 800 (10th Cir.

2005) (concluding that a forum-selection clause providing that "[a]ny suit, action or proceeding with respect to this Agreement shall be brought" in Oklahoma court displaced the arbitration clause of an earlier contract) (internal quotation marks omitted). Indeed, this Court's peers have found that a subsequent agreement with an integration clause displaces an earlier arbitration agreement even when the later contract is entirely silent about how disputes will be resolved. *See, e.g.*, *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1118 (11th Cir. 2014) (finding that subsequent agreement that was "entirely silent on arbitration" displaced an earlier agreement to arbitrate due to the second agreement's integration clause).

*Suski* and these cases thus hold that a later agreement does not need to explicitly supersede an earlier arbitration agreement—or even to talk directly about arbitration—in order to displace an earlier arbitration agreement. Rather, as with any other contract-interpretation question, the later contract's words must be given "their ordinary meaning" with the "common or normal meaning of language . . . given to the words of [the] contract." *Doe 1, v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) (internal quotation marks

omitted). If the "common or normal" meaning of the words in a later forum-selection clause suggests that disputes should be resolved in court, then that later contract is implicitly inconsistent with an earlier agreement requiring arbitration, displacing that earlier contract. Twitter's explicit agreements in 2018, 2019, 2020, 2021, and 2022 that it would "submit to and consent to the jurisdiction" of California courts "for purposes of litigating any dispute that arises under" the Award Agreements and its agreement "that such litigation will be conducted in" those courts is plainly inconsistent with the idea that all disputes about the Award Agreements have to be settled in arbitration. Those later Award Agreements foreclose Defendants' attempt to force Berland to arbitrate her claims that Musk, X Holdings, and X Corp. breached the Award Agreements.

### B.  Defendants' reading of the Award Agreements makes the forum-selection clauses superfluous.

Because *Suski* disposes of Defendants' appeal, they make two arguments to try to avoid that decision. The first is to claim that the forum-selection clause in this case "is perfectly consistent with [] the Dispute Resolution Agreement" because the Award Agreements' forum-selection clauses can be

43

understood as only applying to litigation "*about* arbitration, such as to enforce arbitration or confirm or vacate an arbitration award." Defs.' Br. at 17–20. Coinbase made the same argument in *Suski*, and this Court rejected it. *See* 55 F.4th at 1231. This Court should do the same thing here.

The basic problem with Defendants' attempt to "harmonize" the Award Agreements' forum-selection clauses with the earlier Dispute Resolution Agreement is the one identified by the District Court: It makes the forum-selection clauses superfluous. *See* 1-ER-8. After all, the forum-selection clause explicitly recognizes that "dispute[s]" may "arise[] under [the] Award Agreement[s]." 2-ER-148 (¶ 24). It recognizes that those disputes may be "litigat[ed]." *Id.* And it recognizes that the parties "agree[d] that such litigation *will be conducted in the courts*" of California, with the parties "submit[ting] to and consent[ing] to" those courts' jurisdiction. *Id.* (emphasis added).

But according to Defendants, any dispute related to the Award Agreements is also a dispute about the terms of Berland's employment, which must be arbitrated under the Dispute Resolution Agreement. That means

that no dispute that "arises under" the Award Agreements could *ever* be lit-

igated. And because no dispute arising from the Award Agreements can be

litigated, the parties' agreement that such litigation "will be conducted" in

California courts is meaningless: No possible dispute is impacted by those

forum-selection clauses because no possible dispute falls within Defendants'

interpretation of them. Defendants' proposed interpretation thus runs afoul

of one of the most basic rules of contract law: Contract provisions should not

be interpreted in a way that makes them superfluous. *See, e.g.*, *Sunline Com-*

*mercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019)

(explaining that under Delaware law, courts should avoid interpreting a

contract in a way "that would render any term mere surplusage") (internal

quotation marks omitted); *United Farmers Agents Ass'n, Inc. v. Farmers Grp.,*

*Inc.*, 244 Cal. Rptr. 3d 27, 41 (Ct. App. 2019) ("We strive to give effect to all

of a contract's terms, and to avoid interpretations that render any portion

superfluous, void or inexplicable.") (internal quotation marks omitted).

It is no answer to say, as Defendants do, that the Award Agreements'

forum-selection clauses can be understood as specifying where litigation

"*about* arbitration, such as to enforce arbitration or confirm or vacate an arbitration award" is to take place. Defs.' Br. at 19. But litigation "about arbitration"—such as a petition to enforce the arbitration agreement or to confirm or vacate an arbitration award—would not "arise[] under" the Award Agreements; it would arise under *the Dispute Resolution Agreement*. Defendants concede this exact point: As they say in their own brief, their motion to compel arbitration "is seeking to enforce the Dispute Resolution Agreement (not the 2013 Equity Plan and Award Agreements)." Defs.' Br. at 12 n.1. Dictionary definitions recognize the same point. *See, e.g.*, "Arise," Black's Law Dictionary (12th ed. 2024) (explaining that a claim "Arise[s]" under a particular source of law when it "originates" or "stems from" that source of law). So too do courts interpreting similar contract or statutory language. *See, e.g.*, *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 924 (9th Cir. 2011) (concluding that a particular claim "aris[es] under" an agreement containing an arbitration clause only if it "relate[s] to the interpretation and performance of the contract itself") (internal quotation marks omitted); *Premier Floor Care, Inc. v. Albertsons Cos., Inc.*, 2024 WL 4844372, at *4–8 (N.D. Cal. Nov. 20, 2024)

46

(holding that a claim a party breached a particular contract "arise[s] under" the contract, but tort claims related to the contractual relationship do not). Disputes "about" arbitration "arise from" the Dispute Resolution Agreement, not the Award Agreements.

The only type of dispute that would "arise from" the Award Agreements is a dispute about whether one of the parties *breached* their obligations under those agreements. But on Defendants' interpretation, any such dispute must be arbitrated, so they are not affected by the Award Agreements' forum-selection clause. Both in the District Court and in their opening brief on appeal, Defendants have been unable to identify a single possible claim that would actually be affected by their reading of the Award Agreements' forum-selection clause. For that reason, their proposed interpretation must fail.[4]

---

[4] Defendants briefly suggest that the Award Agreement's forum-selection clause would apply "if the Dispute Resolution Agreement does not cover the specific claim at issue." Defs.' Br. at 19. But they do not identify any claim that would "arise under" the Award Agreements but not also be covered by the Dispute Resolution Agreement. Under their interpretation of the agreements, there can be none. Defendants also assert that the Award Agreement would apply if the parties later agreed to supersede or depart from their

Defendants' cabined reading of the forum-selection clauses of the Award Agreements makes them superfluous for another reason: Even if the Award Agreements could be understood as dictating where some litigation "about arbitration" would need to take place, the Dispute Resolution Agreement already addressed that issue and chose the *very same forum* as the Award Agreements. The Dispute Resolution Agreement is "governed by the Federal Arbitration Act." 2-ER-290 (¶ 1). And it provides that any arbitration under the Dispute Resolution Agreement is to occur "no more than 45 miles from the place where the Employee reported to work for the Company." 2-ER-291 (¶ 3). In Berland's case, when she started her tenure at Twitter, that place was San Francisco. *See* 2-ER-285–86 (¶¶ 1, 5–6) (requiring Berland to report to Twitter's CEO and paying for her relocation to San Francisco).

---

Dispute Resolution Agreement in favor of litigation. *Id.* But it makes no sense that Berland and Twitter would agree in advance about which court would have jurisdiction over a lawsuit if Berland and Twitter were to agree *in the future* to supersede their 2016 agreement to arbitrate. And it is particularly strange to suggest they would enter into a contract for that perversely narrow purpose without even *mentioning* the Dispute Resolution Agreement or saying anything about arbitration at all.

Because the Dispute Resolution Agreement required any arbitration to take place in the Bay Area, only the Northern District of California could grant a petition to compel arbitration. *See* 9 U.S.C. § 4; *Lexington Ins. Co. v. Centex Homes*, 795 F. Supp. 2d 1084 (D. Haw. 2011) (explaining that a district court can only compel arbitration if the arbitration agreement requires the arbitration to take place in that district). Similarly, a petition to confirm an arbitration award would have to be brought in "the district within which such award was made." 9 U.S.C. § 9. That again is the Northern District of California. The Dispute Resolution Agreement thus *already specified* that litigation "about" arbitration was to take place in Northern California, so there was no need for the parties' to address *that very same issue* and choose *the very same place* for arbitration-related litigation in the Award Agreements.

There is no better way to demonstrate just how pointless the Award Agreements' forum-selection clause would be under Defendants' interpretation than to state what they claim happened: In their view, the parties agreed in 2016 that all disputes related to the employment relationship, including disputes about equity awards under contracts that would not even

exist until years later, had to be settled exclusively in arbitration. They also agreed that any disputes about arbitrability or the enforcement of an arbitration award would be settled in the courts of Northern California. But when Twitter later granted Berland equity in the company and the parties entered into an Award Agreement establishing the terms of that equity grant in 2018, they thought it was important to have a new forum-selection clause specifying where litigation *about arbitration* was to take place. So they wrote a forum-selection clause that chose *the exact same* jurisdiction for those disputes as the one selected by their existing agreement. And even though the whole purpose of this forum-selection clause was to specify where litigation *about arbitration* was to take place, the parties forgot to include the word "arbitration" in this forum-selection clause, neglected to cross reference the Dispute Resolution Agreement, and used language for the forum-selection clause that in no way suggests arbitration. Then they made the same clumsy errors in 2019, 2020, 2021, and 2022.

Defendants provided no reason why sophisticated parties like Berland or Twitter would behave like this. The law of every jurisdiction would reject

this perverse narrative. *See, e.g.*, *United Farmers Agents Ass'n*, 244 Cal. Rptr. 3d at 41 (explaining that courts strive "to avoid interpretations [of contracts] that render any portion superfluous, void or inexplicable.")

Berland's and the District Court's interpretation of the Award Agreements' forum-selection clauses, by contrast, makes perfect sense and gives full effect to all the parties' agreements: Berland and Twitter agreed in 2016 that disputes about her employment relationship would be settled through arbitration. But as that Dispute Resolution Agreement states, agreeing to arbitrate employment disputes was *not* a condition of employment at Twitter, and employees were free to opt out of that arbitration contract. 2-ER-292 (¶ 8). As X Corp. has explained in other litigation, some of Berland's peers did so. *See supra* n.1. When it came time to issue equity to employees, Twitter thus faced inconsistent provisions on where and how any dispute about those equity awards should be resolved: Some employees, like Berland, might have Dispute Resolution Agreements, but others did not. So Twitter ensured uniformity by including a forum-selection clause in the Award Agreements: No matter what else the parties had agreed, disputes about

employees' equity awards would need to be settled in California court. Those forum-selection clauses were limited to the "purposes of litigating any dispute that arises under" the Award Agreements so as not to disturb the parties' pre-existing dispute-resolution contracts in other contexts. And they included integration clauses in these agreements precisely to make clear that the Agreements displaced all earlier contracts or understandings about how disputes regarding the Award Agreements were to be settled. In this respect, this case is again just like *Suski*, where this Court recognized that a forum-selection clause in the Official Rules (the later contract) was necessary because not all Coinbase users had agreed to the same User Agreement and the same arbitration clause. *See* 55 F.4th at 1231.

Berland's interpretation of the forum-selection clauses is thus the only one that accords with ordinary language and this Court's binding precedent. And it is the only one that makes any sense.

C.  **The 2018–2022 Award Agreements do not "predate" the 2016 Dispute Resolution Agreement and are not part of a single 2016 transaction.**

*Suski* establishes that when the forum-selection clause of a later-in-time agreement is inconsistent with the arbitration clause of an earlier agreement, the later agreement controls. That disposes of Defendants' efforts to ignore the Award Agreements and compel arbitration of this dispute. So Defendants try to avoid *Suski* by claiming throughout their brief that the Award Agreements the parties signed in May 2018, March 2019, April 2020, April 2021, and April 2022 should really be seen as part of the "2013 Equity Plan" and therefore be treated as part of the same contractual undertaking as the 2016 Dispute Resolution Agreement. *See, e.g.*, Defs.' Br. at 2 (characterizing the forum-selection clause as a "venue provision in the 2013 Equity Plan"); *id.* at 5 (asserting that the "2013 Equity Plan contains" the "venue provision" on which Berland relies); *id.* at 7 (same); *id.* at 8 (claiming that the forum-selection clause "preceded the Dispute Resolution Agreement by several years"). Based on this factual narrative, Defendants cite a handful of pre-*Suski* cases applying California law to situations where the parties entered

53

into *a single contract* (or a group of related contracts executed at the same time) that contained both a forum-selection clause and an arbitration clause. *See, e.g.*, *id.* at 21–22 (citing *Ma v. Golden State Renaissance Ventures, LLC*, 2021 WL 2190912, at *7 (N.D. Cal. May 31, 2021); *Roma Mikha, Inc. v. S. Glazer's Wine & Spirits, LLC*, 2023 WL 3150076, at *1–2, *6 (C.D. Cal. Mar. 30, 2023)). Defendants thus contend that even though their reading of the forum-selection clause in the Award Agreements is unnatural and makes those clauses superfluous, it is the only one this Court can adopt.

Defendants' effort to treat the 2018–2022 Award Agreements' forum-selection clause as part of the parties' 2016 contractual undertaking fails for one obvious reason: 2018 occurred after 2016. Defendants try to muddy this timeline by falsely asserting again and again that the forum-selection clauses of the Award Agreements appear in "the 2013 Equity Plan." *See, e.g.*, Defs.' Br. at 5 ("The 2013 Equity Plan contains a venue provision."); *id.* at 2, 7.[5] They thus assert that the Award Agreements' forum-selection clause somehow

---

[5] The phrase "2013 Equity Plan" appears more than three dozen times in Defendants' brief.

*predates* the Offer Letter and Dispute Resolution Agreement that Berland signed in 2016, making this case unlike *Suski*. *See e.g.*, *id.* at 8 (asserting that the relevant provision "preceded the Dispute Resolution Agreement by several years").

Defendants' assertions are patently false. They produced the 2013 Equity Plan in discovery. That plan indisputably has no venue provision, forum-selection clause, or other dispute-resolution provision. 2-ER-33–50. The forum-selection clause Berland and the District Court relied on is not in any way "contain[ed] in" that plan. Defs.' Br. at 5.

Defendants' misrepresentation of the record relies not on the 2013 Equity Plan itself but on two *sample* award agreements that were purportedly attached to the 2013 Equity Plan. *See* 2-ER-51–103. Twitter's public filing with the SEC disclosing the 2013 Equity Plan calls these documents "related form agreements." 2-SER-363. Those sample form award agreements are blank, containing no details about any award of equity. *See* 2-ER-78. They were not signed by anyone. *See* 2-ER-79. And although they did contain a "Governing Law and Venue" clause that is the same as the clauses that would later

appear in the Award Agreements Berland and Twitter signed in 2018–2022, the 2013 Equity Plan explicitly advised that all awards pursuant to the plan would be "evidenced by an Award Agreement" that would specify the "terms and conditions" of any equity grant. *See* 2-ER-43 (¶ 7(b)); 2-ER-33 (¶ 2(d)) (defining "Award Agreement"); 2-ER-39 (¶ 4(b)(iv)–(v)) (discussing the administrator's power to approve any Award Agreements and "determine the terms and conditions" of them). By the Plan's express terms, this sample agreement *was just a sample*: If Berland were to ultimately receive equity, her grant would be governed by the terms and conditions found in her actual award agreement.

Berland's Award Agreements provided the very same thing. Right in their preamble, they explain that the terms and conditions of Berland's equity grants were those in the Award Agreements themselves. 2-ER-136; 2-ER-139. Those terms and conditions include an integration clause, providing that the 2013 Equity Plan "and this Award Agreement constitutes the entire understanding of the parties on the subjects covered." 2-ER-148 (¶ 26). And the Award Agreements expressly provided that if they conflicted with any

56

provision of the 2013 Equity Plan, "the provisions of the Award Agreement will govern." 2-ER-146 (¶ 17). Berland and Twitter thus only became bound to the Award Agreements when they signed them. And the terms of those equity awards are those in the Award Agreements themselves. The fact that some of the terms of those agreements appeared in sample contracts that Twitter's lawyers had written earlier is beside the point.[6]

---

[6] This is particularly true because the 2013 Equity Plan gave the Administrator the authority to amend the Plan, to determine the "forms of Award Agreement for use under the Plan," and to determine the "terms and conditions" of any award agreement issued under the Plan. *See* 2-ER-39 (¶ 4(b)(iv)–(v)); 2-ER-50 (¶ 19(a)). The Administrator in fact exercised that authority, as Berland's ultimate awards differed both among themselves and from the 2013 form agreement. *Compare, e.g.*, 2-ER-203 (¶ 3) *with* 2-ER-139 (¶ 3) (adding additional provisions regarding the vesting of awards not found in the May 2018 Award Agreement); 2-ER-140–42 (¶ 7) *with* 2-ER-81–82 (¶ 7) (adding a provision regarding the UK tax consequences that was not found in the sample agreement). As a result, whether Berland's ultimate award agreements would even contain a forum-selection clause and what the terms of any such clause would be were matters that neither Berland nor Twitter could determine *until the Administrator actually issued an award* to her. For the five Award Agreements at issue here, that did not begin to occur until 2018. By treating the earlier form agreement as though it somehow determined in advance the terms of Berland's future equity grants, Defendants rewrite the 2013 Equity Plan and eliminate the Administrator's authority to modify the terms of the Plan and any equity awards under it. Defendants' argument is

In addition to being objectively false, Defendants' argument fails on the burden of proof. After all, it was their burden to prove by a preponderance of the evidence that the parties agreed to arbitrate these claims. *See Knutson*, 771 F.3d at 565. In order to show that the parties understood the 2018–2022 Award Agreements to somehow be part of Berland and Twitter's contractual undertaking in 2016 when she signed the Offer Letter and the Dispute Resolution Agreement, Defendants would have had to present evidence that the parties understood it as such at the time. But in the District Court, Defendants presented no evidence whatsoever that Berland even saw a copy of the 2013 Equity Plan in 2016 when she joined the company. They presented no evidence that she saw a copy of a *sample* award agreement under that plan. They presented no evidence that she or Twitter somehow "agreed" to the terms of a sample agreement in 2016. There was no such agreement: Berland and Twitter only became bound to those terms when they signed the Award Agreements years later. Defendants manifestly did

thus inconsistent with the very Plan they rely on to make their argument and must be rejected.

not meet their burden of showing that the parties somehow assented to contracts they would not sign until 2018 (at the earliest) as part of a contractual undertaking in 2016.

For these reasons, the cases Defendants rely on in their opening brief are all beside the point. *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201 (9th Cir. 2016); *Ma*, 2021 WL 2190912; and *Roma Mikha*, 2023 WL 3150076, all involved the interpretation of a contract that contained *both* an arbitration clause and a venue clause in the same agreement or in agreements that were executed at the same time as part of the same contractual undertaking.[7] As

---

[7] Defendants mischaracterize the issue in *Ma*, asserting that it held "that [a] subsequent venue provision did not override [a] prior arbitration agreement." Defs.' Br. at 21. But *Ma* involved two contracts that were executed as part of a single transaction—a "subscription agreement" and a "partnership agreement"—and applied the rule that "[s]everal documents concerning the same subject and made *as part of the same transaction* will be construed together even if the documents were not executed contemporaneously." *Ma*, 2021 WL 2190912, at *7 (emphasis added). *Ma* thus does not involve a situation remotely like this one, where the parties executed one contract in 2016, and then five other contracts several years later. Defendants also cite cases from other jurisdictions from the same context. *See, e.g.*, *Personal Sec. & Safety Sys. Inc. v. Motorola, Inc.*, 297 F.3d 388, 393 (5th Cir. 2002) (interpreting two contracts that were "executed contemporaneously by the same parties, for

*Suski* already recognized, that is a meaningfully different context: When a single contract contains *both* an arbitration clause *and* a forum-selection clause that are arguably inconsistent, neither provision can be given full effect without making the other one superfluous. So courts must strain to harmonize the two provisions, even if doing so results in reading one of the clauses in an unnatural way. But when parties enter into a *subsequent* agreement with a forum-selection clause, this concern is not present because parties are always free to supersede their earlier agreements. In that context, the later contract must be given its ordinary meaning, and if that meaning is in any way inconsistent with the earlier agreement, the later agreement controls. *Suski*, 55 F.4th at 1230.[8]

_____

the same purposes, and as part of the same transaction") (internal quotation marks omitted). Those cases are similarly irrelevant here.

[8] Defendants' cases are also beside the point because they applied California law. But the Award Agreements are "governed by the laws of Delaware." 2-ER-148 (¶ 24). Delaware law is the same as *Suski*: A "new contract, as a general matter, will control over the old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract." *Country Life Homes*, 2007 WL 333075, at *5; *see also Green Isle Partners*, 2000 WL 1788655, at *4 (refusing to apply dispute-resolution clause found in earlier contract where parties entered into a new agreement containing an

*Suski* thus already distinguished the very cases Defendants rely on, because those cases' approach to interpreting a single contract has no application to "an original contract and a subsequent contract." 55 F.4th at 1231 (distinguishing *Mohamed* on this basis). Defendants' sleight-of-hand with the record does not make this case different from *Suski*.

## II. Defendants waived their purported right to arbitrate.

Regardless of whether the Dispute Resolution Agreement covers Berland's state-law claims, Defendants abandoned their purported right to compel arbitration under that Agreement. Berland raised this basis for denying Defendants' motion to compel arbitration in the District Court, *see* 2-ER-125–29, but the District Court found it unnecessary to reach the issue because it found that the parties had not agreed to arbitrate these claims in the first place, *see* 2-ER-15 (explaining that the District Court "has not ruled on Plaintiff's argument Defendants waived their right to compel arbitration"). In

---

integration clause). Defendants never even address Delaware law or try to show that they can prevail under it, so they have failed to meet their burden for this independent reason.

reviewing the District Court's decision, however, this Court can affirm on any basis in the record, even one not reached by the District Court. *See, e.g.,* *Brown*, 82 F.4th at 874. At a minimum, as Defendants concede, if this Court does not affirm the District Court on its conclusion that Defendants have no right to compel arbitration, it should remand so the District Court can consider the waiver issue in the first instance.

In deciding whether a defendant waived its purported right to arbitrate, this Court applies the same standard for the waiver of any other contractual right. *See Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 460 (9th Cir. 2023) ("[T]his Circuit's rule of waiver of the right to arbitrate . . . is nothing more than the general rule of waiver of a contractual right."). A party thus waives its right to compel arbitration of a particular dispute if "(1) it has knowledge of the right, and (2) it acts inconsistently with that right." *Id.*[9]

---

[9] At one time, this Court's precedent required a showing of prejudice to the party opposing a motion to compel arbitration, but the Supreme Court abrogated that requirement in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022). *See Hill*, 59 F.4th at 468 (explaining that after *Morgan*, prejudice to the opposing party is irrelevant).

Defendants do not—and plainly cannot—dispute that they were aware of the Dispute Resolution Agreement and hence aware of their potential right to compel arbitration. *See* Defs.' Br. at 29 (assuming point). With good reason: As California courts have often held, knowledge of a contractual right is imputed to the drafter of a contract. *See, e.g.*, *Caccuri v. Sony Interactive Ent., LLC*, 735 F. Supp. 3d 1139, 1152 (N.D. Cal. 2024). Defendants were thus aware of their purported right to arbitrate as a matter of law.

The waiver issue thus turns on the second element, namely whether Defendants litigated this case in a manner "inconsistent" with their purported right to arbitrate. *Hill*, 59 F.4th at 468. "There is no concrete to test to determine whether a party has engaged in acts inconsistent with its right to arbitrate; rather [courts] consider the totality of the parties' actions." *Id.* at 471 (internal quotation marks omitted). "Importantly, [the Ninth Circuit has] never held that a party can act inconsistent with its arbitration rights only if the relevant actions are themselves express denials of the right to arbitrate." *Id.*; *see also id.* n. 17 (explaining that an "*express* disavowal of one's arbitration right" is not required "to find an implied waiver occurred"). Rather, waiver

63

can be found where a party undertakes "seemingly common-place" actions that suggest "partiality for a judicial resolution of the claims," such as by moving to dismiss one of the plaintiff's legal theories, participating in discovery, or filing status reports or other court documents suggesting that the case should proceed in court. *See id.* at 472–79.

Defendants contend in their opening brief that they did not do anything that "indicate[d] any waiver of their arbitration rights." Defs.' Br. at 29. But Defendants' argument only works if one ignores nearly all the relevant facts.[10] Once the actual facts and history of this case are considered, it is abundantly clear that Defendants' conduct before the District Court was inconsistent with their belated request to compel arbitration of Berland's state-law claims.

Defendants' first response to the complaint was to challenge one of its legal theories by moving to dismiss Count Two. *See* 2-ER-310–29. As this Court has repeatedly recognized "challenging the merits of [a plaintiff's]

---

[10] Berland raised all these facts in the District Court. *See* 2-ER-127–29.

legal theory" without raising a purported right to arbitrate is inconsistent with a purported right to arbitrate a case. *Hill*, 59 F.4th at 473. If Defendants truly believed that Counts Three and Four had to be arbitrated, there is no good reason why they could not have moved to compel arbitration of those claims at the same time they moved to dismiss a part of the complaint.

More important than the motion Defendants filed, though, is what Defendants said about where Berland's state-law claims should be decided. For months, Defendants repeatedly showed "partiality for a judicial resolution of the claims," *id.* at 472, by repeatedly telling the District Court that Berland's state-law claims should be settled in court. Nowhere is that clearer than in the Joint Statement the parties filed soon after Defendants moved to dismiss one of Berland's counts:

- The Joint Statement asked the parties to identify the disputed "legal issues" in the case. 2-ER-301–02 (¶ 3). They listed seven, including "[w]hether Defendants breached their agreements with Plaintiff" regarding her equity awards. *Id.* Defendants did not identify the arbitrability of those claims as an issue.

- The Joint Statement directed the parties to list the motions they expected to file in the case. Defendants said that they planned to file "cross-motions/briefing under Rules 52 and/or 56 as to the benefits claims [Counts One and Two] *as well as the other claims* [Counts Three and Four]." 2-ER-302 (¶ 4). Defendants thus told the District Court they planned to ask it to resolve Berland's state-law claims on the merits. They again said nothing about arbitration.

- On discovery, Berland asserted that discovery would be necessary on several issues, including her "state law claims," and noted that a stay of discovery based on Defendants' motion to dismiss would be inappropriate because she was "entitled to discovery on her state-law claims" regardless of how that motion would be decided. 2-ER-303 (¶ 8). Defendants did not disagree: They never moved to stay discovery based on any purported arbitration right, and they consented to a scheduling order that

provided for discovery to proceed at once on all Berland's claims. *Id.*; *see also* 2-ER-305–306 (¶ 16).

- Defendants were asked whether the case was "suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation." 3-ER-305 (¶ 13). They said it was not. *Id.* On appeal, Defendants add words to their express disavowal of any arbitration right, asserting they meant only that the case "in its entirety" was not amenable to arbitration. Defs.' Br. at 6. But if they meant that, they could have said it in the District Court.

- The Joint Statement asked the parties to discuss trial. Defendants told the Court that trial was likely unnecessary because "most, if not this entire case *should be adjudicated through Rule 52 motions*." 2-ER-306 (¶ 17) (emphasis added). But if those motions were insufficient, the case would be resolved at a bench trial. *Id.* Defendants again never suggested that part of this case could only be resolved through arbitration.

67

- Days later, the parties appeared for a conference. During that conference, Defendants' counsel explicitly acknowledged that Berland had a right to a jury trial on Counts Three and Four. 1-SER-68 (13:9–21). Defendants again said nothing about arbitration.

All told, Defendants told the District Court at least six times that they believed Berland's state-law claims should be resolved by the District Court. They never identified the arbitrability of those claims as an issue or advised that they may move to compel arbitration. And they told the Court the case was not referable to arbitration. Defendants' course of conduct plainly shows "partiality for a judicial resolution of" of Berland's state-law claims, precluding them from later seeking to compel arbitration of them. *See Hill*, 59 F.4th at 472.

Defendants' statements to the District Court are alone enough to find that they acted inconsistently with their purported right to arbitrate. But their conduct in discovery points to the same place. Soon after the Joint Statement and related conference, Defendants served their Rule 26 Initial

Disclosures, which identified documents in their possession relevant to Counts Three and Four of the complaint. *See* 1-SER-75. Berland then served her initial requests for production and interrogatories, which included requests relevant to Counts Three and Four. *See* 1-SER-121–23 (Requests No. 55–58). Defendants never objected to these discovery requests on the ground that Berland's state-law claims had to be arbitrated. *See* 1-SER-80–86, 121–23f. And they never sought any sort of stay of discovery on the ground that Berland's claims should be in arbitration, not the District Court.

The very first time Defendants ever said the word "arbitration" was in May, seven months after the case was filed, and days after they lost their motion to dismiss. *See* 2-ER-266–93. It is no great mystery why they waited until then: Defendants made the strategic choice to stay silent about arbitration and instead challenge the legal theory behind one of Berland's ERISA claims, hoping that they could pare back her lawsuit so it could be more easily defended in court. It was only when that strategy failed that they switched course, deciding the better approach was to try to weed out Berland's state-law claims on which she was entitled to a jury. That sort of

strategic about-face is exactly what the waiver doctrine prohibits. *See Hill*. 59 F.4th at 477 (finding that a defendant waived its right to arbitrate where it made the "strategic choice to engage the judiciary for resolution" of the claims "rather than to obtain a resolution from an arbitrator").[11]

These points in the record are more than enough to show that Defendants acted inconsistently with their purported right to arbitrate and therefore waived it. But at a minimum, if this Court were to conclude that Berland's claims are subject to the Dispute Resolution Agreement, it should remand to the District Court to consider the waiver issue in the first instance. Defendants concede as much, arguing that the District Court "is in the best position to address" this issue, Defs.' Br. at 28, and asking this Court not to reach the "inherently fact-bound inquiry" of waiver "without the district court first deciding the issue," *id.* at 3. The record is more than adequate for this Court

---

[11] In another case currently before this Court, *Media Matters for America v. X. Corp.*, No. 25-2463 (9th Cir.), X. Corp is arguing that failure to raise a contractual right to resolve the case in a particular forum "for the first six-and-a-half months of litigation" is itself enough to find "a knowing and intentional waiver" of that right. X Corp. Opening Br. at 31–35. Berland agrees.

to find waiver in the first instance, so it can and should affirm on that basis. But at a minimum, it should let the District Court take up this issue.

## CONCLUSION

The Court should affirm the District Court's decision denying Defendants' motion to compel arbitration of Counts Three and Four of the complaint.

Dated: January 21, 2026   Respectfully submitted,

/s/ *David R. Roth*
David R. Roth
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
203.498.4400
droth@wiggin.com

Nathan E. Denning
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, New York 10022
212.551.2600
ndenning@wiggin.com

Teresa S. Renaker
Kirsten G. Scott
RENAKER SCOTT LLP
505 Montgomery St., Suite 1125
San Francisco, CA 94111
415.653.1733
teresa@renakerscott.com
kirsten@renakerscott.com

*Attorneys for Plaintiff-Appellee*
*Leslie Berland*

## STATEMENT OF RELATED CASES

Undersigned counsel for Leslie Berland is unaware of any related cases currently pending in this Court.

Dated: January 21, 2026        Respectfully submitted,

*/s/ David R. Roth*
David R. Roth

*Attorney for Plaintiff-Appellee Leslie Berland*

## CERTIFICATE OF COMPLIANCE

This brief contains 13,726 words, including words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface (14-point Palatino Linotype) comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated: January 21, 2026

/s/ *David R. Roth*
David R. Roth